**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| SARA E. D.,[1]<br><br>Plaintiff,<br><br>vs.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | No. 25-CV-2025-LTS-KEM<br><br>**REPORT AND RECOMMENDATION** |

---

Plaintiff Sara E. D. seeks judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Plaintiff argues that the administrative law judge (ALJ) erred in evaluating her migraines, in finding she could be on her feet for four hours a day, and in failing to develop the medical-opinion evidence. I recommend **reversing** the ALJ's decision.

## ***I. BACKGROUND***

Plaintiff was born in 1981 and worked as a hairstylist at a salon from 2004 to 2015. *See* AR 130, 280, 3898.[2] She has suffered depression and anxiety, as well as what she describes as mania, her whole life. *See* AR 3458, 3977. After a car accident in 2008, she began experiencing neck pain and associated migraines, and her migraines

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] "AR" refers to the administrative record below (Doc. 5). At 7,606 pages, this is the lengthiest administrative record this court has encountered in nearly ten years of working on Social Security cases, with not very many duplicated treatment notes.

worsened in 2014 with the stress of a lengthy hospitalization for her daughter. *See* AR 2070. She began frequenting the emergency room (ER) for a cocktail of medications and fluids to bring her headaches under control when her prescription medications did not work. *See id.* After one such visit in March 2015, she continued to feel foggy and light-headed the next day, and her work raised concerns about her functional abilities and placed her on a leave of absence. AR 376, 414-15. She continued to report throughout summer 2015 that the salon would not schedule her due to her frequent migraines, and she was ultimately fired. *See* AR 307, 379, 416, 1976, 2056, 2064, 3948. She filed a prior application for disability in October 2015, which was denied on initial review in January 2016; she did not appeal. AR 157.

Plaintiff began treatment with headache specialists at the Mayo Clinic in July 2015. *See* AR 2070. Her migraines reduced in frequency through a combination of Botox injections and other medications. *See* AR 2040, 2301-06. She began working full-time at a new salon in December 2015. AR 282, 365. The Mayo Clinic discharged her as a patient, and she continued their protocol (including Botox injections) with a local neurologist, Dr. Sangeeta Shah, MD. *See* AR 2040-43. Because the Botox tended to wear off after two months (but was only given every three months), Dr. Shah started administering trigger point injections one-and-a-half to two months after a Botox injection to tide Plaintiff over. *See* 2268-71, 2371. Treatment records reflect Plaintiff continued to present to the ER with headaches on occasion.

Plaintiff's neck pain (cervical spine) increased after a serious rollover car accident in October 2015. AR 990, 2056.[3] She saw Nurse Practitioner (NP) Melissa Groeneveld at the pain clinic for treatment of this condition (first with injections, then opiates and Soma (carisoprodol), a muscle relaxer). *See* Doc. 9.[4]

---

[3] Plaintiff was also involved in car accidents in February and October 2016. AR 503, 1421.

[4] Plaintiff's brief contains a helpful summary of the treatment records in chronological order.

In October 2015, Plaintiff reported residual left knee pain from a high school sports injury, and in December 2016, she reported this pain worsening after a fall down the stairs. *See* AR 586-87, 1953, 2696. She attended physical therapy in October and November 2017. AR 437-79. She continued to report knee pain and underwent an MRI[5] in December 2017. AR 581. She received injections in early 2018 from orthopedic surgeon Dr. Christopher Eagen, DO. Doc. 9. Dr. Eagen ultimately performed a partial left knee replacement in March 2019, after which she underwent physical therapy. *Id.*

Plaintiff stopped working in September 2017 after she began suffering increased "auditory hallucinations" and checked herself into the hospital at her psychiatrist's urging for medication adjustments. *See* AR 434, 480-86. After this, Plaintiff did not often report auditory hallucinations, and when she did, providers noted they were not a sign of psychosis, since she recognized the voices were not real (they were often people she knew saying negative things). *See* AR 3458, 3461, 3985. Throughout the relevant period, Plaintiff saw psychiatrists every few months for medication management (Dr. Mohammad Iqbal, MD; Dr. Darko Zdilar, MD; and Dr. Ann Rathe, MD). *See* Doc. 9. She also attended therapy with Katie Haberman, LISW. *Id.*

Plaintiff filed the current application for DI benefits on October 11, 2017, alleging disability since September 16, 2017, based solely on mental-health conditions (bipolar, PTSD,[6] and anxiety). AR 157-58. The Social Security Administration denied Plaintiff's application on initial review in January 2018. AR 156-66. Plaintiff appealed, additionally alleging migraines, and the Social Security Administration denied her claim on reconsideration in April 2018. AR 167-81. In connection with those reviews, state agency psychological consultants opined as to her mental residual functional capacity

[5] Magnetic Resonance Imaging.

[6] Post-traumatic stress disorder.

(RFC),[7] and a state agency medical consultant on reconsideration opined as to the limitations caused by her migraines. AR 162-64, 176-79.

Plaintiff's first ALJ hearing occurred in June 2019, and the ALJ issued an opinion denying her claim in August 2019. AR 91-104, 126-55. Shortly thereafter, in October 2019, Plaintiff presented to the ER after falling down the stairs when her knee gave out. AR 4847. Later that month, Dr. Eagen performed an arthroscopy on her left knee due to a meniscus tear. AR 4841. Plaintiff did not complain of left knee pain again until April 2020, when she again presented to the ER after her left knee gave out. *See* Doc. 9. She later met with Dr. Eagen, who gave her a brace, and underwent physical therapy from May through July 2020. *Id.* She underwent gastric sleeve surgery in February 2020 and ended up losing more than 100 pounds. *Id.*

The Appeals Council denied Plaintiff's request for review in July 2020. AR 3777-83. A few treatment notes thereafter (in September and October 2020) reflect that Plaintiff had begun taking a few hair appointments (styling or cutting). *See* AR 6642, 6657, 6660, 6667, 6672. In November 2020, she started working part-time at a salon owned by a former coworker. *See* AR 3948, 4540, 5538, 5864. Originally, she planned to work twenty hours a week, training other stylists and working the front desk, and not do hair—at various times, she said due to hand and wrist pain, issues standing or keeping her arms lifted, or anxiety about having to cancel appointments with clients due to her health issues. AR 3948, 4540, 4556, 5358-59, 5380, 5538; *see also* AR 4556, 4591 (reported missing work due to pain and issues standing in December 2020 and February 2021). In April 2021, she reported working two to three days a week; in July 2021, she reported averaging twenty hours a week; and in October 2021, she said she recently cut back on her hours at the salon, from four days a week to two to three days a week, for "better work-life balance and less pain." AR 5380, 5397, 5401. In the summer of 2021,

[7] RFC means "the most that a claimant can do despite her limitations." ***Sloan v. Saul***, 933 F.3d 946, 949 (8th Cir. 2019).

she began styling hair again—the letter her boss submitted to the Social Security Administration in 2023 explained that her unscheduled absences and difficulties remembering how the system worked made the receptionist position untenable for her, even working only four to ten hours a week. AR 3948, 4670, 5401, 5405, 6817. Her boss's letter stated she began working behind the chair one to two times a month, but it appears to have been more than that at first; her boss also said she only scheduled clients who would understand if she needed to cancel last minute due to health reasons. AR 3948. Plaintiff told many providers in 2021 and 2022 that her boss was very understanding of her health issues. AR 5410, 5485, 5526.

Beginning in September 2020, NP Groeneveld's treatment records reflect that rather than complaining of neck pain, Plaintiff complained of back pain. AR 4498. She underwent physical therapy for her back that fall. *See* AR 6631-85, 6689-93. She also established care with a new primary care provider and began using medical cannabis for pain. *See* AR 6831-33. She reported a fall down the steps in December 2020. AR 4556. Throughout 2021, Plaintiff continued to complain of neck and back pain, migraines, and mental health, but her health issues seemed largely stable. *See* Doc. 9.

Plaintiff appealed the denial of her DI claim to this court, and the parties consented to remand in August 2021. AR 3784-87. In October 2021, she presented to the ER after she stood up too quickly, felt dizzy, and fell and hit her head on the kitchen countertop. AR 4755. In December 2021, she suffered a similar fall and was ultimately admitted to the hospital for ten days with a fractured rib and collapsed lung. *See* Doc. 9.

In early 2022, Plaintiff continued to report rib and back pain from her fractured rib, but it had improved by July. *Id.*; AR 5022. She also reported increased headaches as a result of the fall. *See* AR 4981, 5015. On March 31, 2022, she began to complain of left knee pain again. Doc. 9. An MRI revealed a stress fracture of the medial tibial plateau, and Dr. Eagen prescribed a medial unloader brace. AR 5006. In July 2022, the health system that owned the pain clinic she attended changed their policy so that providers could not prescribe opioids if the patient used medical marijuana; Plaintiff did

not return to NP Groeneveld after that, telling her psychiatrist she did not see the point. AR 5415. By the fall of 2022, Plaintiff had transitioned from Botox to Vyepti for migraine prevention, receiving an infusion of this medication every three months. Doc. 9. There are no ER treatment records related to migraines after Plaintiff made this switch. *Id.* Plaintiff continued to complain of knee pain throughout 2022 and ultimately consulted with orthopedic surgeons at the University of Iowa late in the year. Doc. 9. They recommended a total left knee replacement due to arthritic changes shown on her MRI. AR 7399.

In 2022, many treatment records reflect Plaintiff reported working only a few hours a week. *See* AR 5406 (January 2022: reported back to working part time after being off due to her fall and hospitalization); AR 5410 (April 2022: told Dr. Rathe that she was working only five hours per week because of severe pain and depression, noting her employer agreed she should step back for a while; and that her headaches had become incapacitating twice daily and caused her to miss work); AR 4485 (May 2022: told therapist it was possible for her to work a few hours a week due to not being depended on by others and having a supportive boss); AR 5012 (June 2022: told Dr. Eagen that it was wedding season and "standing and walking get her by the end of the day"); AR 5416 (July 2022: told Dr. Rathe she had been working a "couple hours here and there at the salon, training staff"); AR 5425 (September 2022: told Dr. Rathe she worked a few hours a week at the beauty salon, mainly doing hair for wedding parties); AR 5430 (November 2022: told Dr. Rathe she worked two days—six hours—per week, limiting her work due to knee pain and swelling with standing); AR 5435 (December 2022: told Dr. Rathe she was working a few hours a week at the salon, once a week, noting very limited hours due to standing limitations and only doing two haircuts a week); AR 5439 (January 2023: told Dr. Rathe she worked only a few hours a week).

In late January 2023, Dr. Eagen performed a total knee replacement. Doc. 9. Although surgery and physical therapy improved Plaintiff's knee pain, shortly thereafter she began complaining of numbness and burning pain down her left leg and into her foot.

*See* AR 6118. Dr. Eagen referred Plaintiff to Dr. Shah in neurology (the same Dr. Shah who managed her migraines); an EMG[8] of Plaintiff's left leg was abnormal. AR 6523. Providers had different theories about what could be causing Plaintiff's sciatic pain, including degenerative changes in Plaintiff's back or nerve damage from the tourniquet used during surgery. *See* AR 6118, 6556, 7340, 7443. Plaintiff reported working three hours a week on average due to pain and resigned her job at the salon on March 31, 2023 (consistent with earnings of only $526 in 2023). AR 3948, 5853, 5861, 5864.

The Social Security Administration held a second hearing in April 2023, and an ALJ again denied Plaintiff's request for benefits. AR 3712-51, 3686-3701. Plaintiff attended eight physical therapy sessions for her sciatic pain in May and June 2023, exhausting her insurance physical therapy benefits for the year before completing any goals. AR 6537. The record appears to be missing some treatment records, but it reflects that Plaintiff received epidural steroid injections, two nerve blocks, and a radiofrequency ablation for her back (likely an attempt to treat her sciatic pain) during the summer of 2023. AR 7184-94. In November 2023, she presented to the ER after suffering from a fall that caused her to knock out two of her teeth on a table; she stated her leg had given out due to her sciatic pain. AR 7320-21. She consulted with a neurosurgeon in January 2024, noting her orthopedic surgeon believed her sciatic pain was being caused by her back; the neurosurgeon disagreed and did not see anything on her lumbar spine imaging to suggest her back (and particularly, L5-S1) was the problem (even though her EMG suggested S1 radiculopathy). AR 7345; *see also* AR 7463 (Plaintiff told Dr. Rathe in early December 2023 she was waiting for her appointment with the neurosurgeon regarding her sciatic pain).

In the subsequent appeal, the parties once again consented to remand to the Social Security Administration, and this case was remanded in March 2024. AR 5682-85. In April 2024, Plaintiff told Dr. Rathe she was obtaining a second opinion from a different

[8] Electromyography.

orthopedic surgeon, and in May 2024, she reported that doctor had ordered a new lumbar spine MRI (these treatment notes are not in the record). *See* AR 7484, 7494. Plaintiff returned to Dr. Shah in neurology in June 2024 related to her left leg sciatic pain. AR 7429. Dr. Shah prescribed Savella, ordered a brain MRI, and referred her to the University of Iowa pain clinic. AR 7361, 7429, 7442. The pain clinic believed that a stimulator on the common peroneal nerve could help Plaintiff's pain, and she wanted to proceed with this procedure, but her insurance refused to cover it. AR 7369, 7444. In September 2024, Plaintiff returned to her previous pain clinic (NP Groeneveld had left, so she met with a new provider). AR 7443. The provider increased her Savella dosage and referred her to a nerve specialist at the Mayo Clinic; Plaintiff's partner became frustrated and upset that there were no better options for Plaintiff's pain after seeing numerous providers. AR 7452. Plaintiff's date last insured expired on September 30, 2024.

Plaintiff met with Dr. Robert Spinner, MD, at the Mayo Clinic in late October 2024. AR 7528. Dr. Spinner repeated the EMG, which showed abnormalities in the sural and peroneal nerves of Plaintiff's left leg. AR 7529. Dr. Spinner followed up by ordering a musculoskeletal ultrasound of these nerves, which did not show any structural abnormalities of either nerve. AR 7596. He believed he could perform surgery to decompress the peroneal nerve in her left leg, which might help her sciatic pain. *Id.*

The Social Security Administration held a third ALJ hearing in early November 2024, which ran long and was continued on December 16, 2024. AR 5591-5652. Plaintiff testified that she would be undergoing surgery with Dr. Spinner in the near future.

The ALJ denied Plaintiff's request for DI benefits for the third time on January 31, 2025, and it is this decision that is currently under review. AR 5559-77. The ALJ

followed the five-step process outlined in the regulations[9] to determine whether Plaintiff was disabled during the relevant time period. *Id*. The ALJ found Plaintiff suffered severe impairments that included injury to the left knee and neck, migraines, obesity, depression, anxiety, bipolar disorder, and borderline personality disorder. AR 5562. To aid in steps four and five, the ALJ determined Plaintiff's RFC, finding Plaintiff could perform light work[10] with the following additional limitations:

> [S]he could stand and/or walk four hours in an eight hour workday. She could not kneel or crawl. She could occasionally stoop, crouch, balance, and climb ramps and stairs. She could not climb ladders, ropes, or scaffolds. She could have no exposure to potential workplace hazards such as moving machinery or unprotected heights. She could not operate foot controls or ambulate on wet, uneven, or moving surfaces. She could have no fast paced production requirements defined as work requiring more than frequent handling[,] fingering, or reaching bilaterally. She could occasionally reach overhead. She could tolerate occasional exposure to extreme heat, cold, humidity, or potential pulmonary irritants such as fumes[,] odors[,] dusts, or gases. She is limited to a moderate noise environment. She is limited to occasional interaction with coworkers, supervisors, and the general public.

AR 5566. In determining Plaintiff's RFC, the ALJ considered the medical opinions of record, including from the state agency medical consultants, Dr. Rathe, and Therapist Haberman, and found them all unpersuasive. AR 5574-75. No medical opinion addressed the limitations caused by Plaintiff's knee impairment and other physical issues (other than migraines). Based on VE testimony, the ALJ concluded Plaintiff could

---

[9] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." ***Grindley v. Kijakazi***, 9 F.4th 622, 628 (8th Cir. 2021) (quoting ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. § 404.1520(a)(4)**. The claimant bears the burden of persuasion to prove disability. ***Goff***, 421 F.3d at 790.

[10] Light work requires the ability to lift and carry ten pounds frequently and twenty pounds occasionally. **20 C.F.R. § 404.1567(b)**.

perform a significant number of jobs in the national economy, including mail clerk, merchandise marker, and routing clerk. AR 5576. Thus, the ALJ found Plaintiff not disabled from September 16, 2017, through September 30, 2024, the date last insured. AR 5577.

The ALJ's decision became the final decision of the Commissioner after sixty days passed.[11] Plaintiff filed a complaint in this court (Doc. 1), and the parties briefed the issues (Docs. 9, 15-16). The Honorable Leonard T. Strand, District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## ***II. DISCUSSION***

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[12] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[13] The court "do[es] not reweigh the evidence or review the factual record de novo."[14] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[15]

As an initial matter, Plaintiff argues that the ALJ's RFC is not supported by any medical-opinion evidence, relying on a line of cases from this district that were recently abrogated by the Eighth Circuit.[16] Thus, to the extent Plaintiff argues the ALJ erred as

---

[11] *See* **20 C.F.R. § 404.984**.

[12] ***Grindley***, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[13] ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007).

[14] ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).

[15] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

[16] *See, e.g.*, ***Hall v. Saul***, No. 19-CV-3019, 2020 WL 5229539, at *6 (N.D. Iowa May 27, 2020) ("The ALJ may not impose fewer limitations than found in all the medical-opinion evidence and thereby formulate his own medical opinion."), *report and recommendation adopted*, 2020 WL 3121226 (June 12, 2020) (clear-error review), *abrogated by* ***Bonham v.***

a matter of law by imposing fewer restrictions than found in the medical opinions, I recommend rejecting this argument.

Plaintiff argues that the ALJ erred in evaluating the severity and frequency of her migraines, such that the ALJ should have found medical equivalence to Listing 11.02B and included limitations related to missing work and being off-task in the RFC. Next, Plaintiff argues that the ALJ erred in finding she could stand and walk for four hours, especially because the record lacked medical-opinion evidence evaluating the effects of her left knee impairment, neck and right arm pain, and obesity[17] on her physical functioning. Plaintiff also argues that the ALJ should have further developed the record on her mental functioning by obtaining consultative examinations.

### *A. Migraines*

Plaintiff argues that the ALJ erred in evaluating the frequency and severity of her migraines and should have considered a closed period of benefits prior to her starting Vyepti in 2022. Plaintiff argues the ALJ's errors impacted both the step-three and RFC determination.

During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1.[18] "[A claimant's] impairment[] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the

***Bisignano***, 177 F.4th 934, 940-42 (8th Cir. 2026) (rejecting "categorical rule" that to be supported by "some medical evidence," the ALJ's RFC must be supported by a "medical opinion" evaluating the claimant's ability to function).

[17] Plaintiff points to medical records reflecting her weight and BMI (body mass index), noting she was obese from her onset date in September 2017 through a few months after her gastric sleeve surgery in February 2020. *See* Doc. 9.

[18] **20 C.F.R. § 416.920(a)(4)(iii)**.

introduction, and meets the duration requirement."[19] If a claimant's impairment is not described in the listings (like migraines), the Social Security Administration compares the claimant's "findings with those for closely analogous listed impairments"; "[i]f the findings related to [the claimant's] impairment[] are at least of equal medical significance to those of a listed impairment," it equals the listing and the claimant is disabled.[20]

At step three, the ALJ recognized that guidance from the Social Security Administration provides that Listing 11.02 (specifically subparts B and D), governing epilepsy, "is the most closely analogous listed impairment for a primary headache disorder." AR 5564.[21] Listing 11.02B "requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment."[22] Listing 11.02D requires less frequent seizures—"once every 2 weeks"—but additionally mandates a "marked limitation" in one of the following categories: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.[23]

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, [the Social Security Administration] consider[s]: A detailed description from [a medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed

[19] **20 C.F.R. § 416.925(c)(3)** (citation omitted).

[20] **20 C.F.R. § 416.926(b)(2)**.

[21] *Accord* **Social Security Ruling (SSR) 19-4p**, 84 Fed. Reg. 44667, 44671 (Aug. 26, 2019).

[22] **SSR 19-4p**, 84 Fed. Reg. at 44671; *see also* **20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.00H(1)(b), 11.00H(4), 11.02B** (defining dyscognitive seizures as involving "alteration of consciousness without convulsions or loss of muscle control," with "blank staring, change of facial expression, [or] automatisms[] such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances"; and noting that in evaluating the frequency of seizures, the Social Security Administration considers "adherence to prescribed treatment" and "count[s] multiple seizures occurring in a 24-hour period as one seizure").

[23] **20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02D**.

> treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).[24]

In evaluating medical equivalence to Listing 11.02D, the Social Security Administration considers the same factors, plus whether the claimant has a "marked limitation" in functioning.[25]

Here, the ALJ found that Plaintiff's headaches were not equal in severity to seizures. AR 5564. The ALJ relied on the lack of "objective evidence indicating that h[er] headaches are incapacitating, even temporarily, as one would expect with a seizure disorder." *Id.* The ALJ found no "physical exams . . . document[ed] co-occurring observable signs, such as occasional tremors, problems concentrating or remembering, neck stiffness, dizziness, gait instability, skin flushing, nasal congestion or rhinorrhea (runny nose), puffy eyelid, forehead or facial sweating, pallor, constriction of the pupil, drooping of the upper eyelid, red eye, secretion of tears, and the need to be in a quiet or dark room during the examination." *Id.* This list of symptoms is taken from a portion of SSR 19-4p that addresses how to determine if headaches are a medically determinable impairment for purposes of step two; one of four factors the Social Security Administration considers is whether the record contains "[a]n observation of a typical headache event, and a detailed description of the event including all associated phenomena, by an [acceptable medical source]" (the symptoms are provided as examples of things a medical source might observe "prior to, during, and following the headache

---

[24] **SSR 19-4p**, 84 Fed. Reg. at 44671.

[25] ***Id.***

event").[26]

The record contains many treatment notes (from the ER and other providers) where Plaintiff complained of currently suffering a migraine and sought injectable medications to treat it (usually fluids, Toradol (an NSAID),[27] and Benadryl; and occasionally Nubain (an opioid)). Most of these treatment notes are sparse and do not contain the objective observations wanted by the ALJ. A few note mild or moderate distress, but most reflect no acute distress. *Compare* AR 3108, 4703, *with* AR 466, 3083, 3105, 3111, 3344, 4684, 4767, 4790, 4793, 4795, 4801, 4808, 4814, 4817, 4831; *see also* 3075 (alert and awake, sitting upright comfortably in bed). Unrecognized by the ALJ, two ER treatment notes *do* reflect Plaintiff was "wearing sunglasses and has the room dark" (in mild distress) (AR 5218) or "sitting in bed" comfortably in no acute distress "in a darkened room with sunglasses on" (AR 3098). Plaintiff additionally points to an urgent care treatment note where Plaintiff presented with a migraine to obtain a Toradol injection; but she also reported a fever, sinus pain and congestion, nasal drainage, and generally feeling unwell (so this was not a "typical" migraine event). AR 6804-06. Overall, however, as will be discussed further below, substantial evidence supports the ALJ's determination that Plaintiff's migraines were not so severe on a weekly (or biweekly) basis such that they equaled Listing 11.02.

In determining RFC, the ALJ limited Plaintiff's exposure to extreme heat, cold, humidity, smells, and noise. AR 5566. The ALJ did not include limitations related to being off task or unscheduled absences, which Plaintiff argues are necessitated by her migraines (at least for some of the relevant time period). The ALJ recognized that since her onset date, Plaintiff visited the ER due to migraines four to five times a year, and canceled a few appointments due to migraines. AR 5569.[28] But the ALJ noted Plaintiff

---

[26] ***Id.*** at 44670.

[27] Nonsteroidal anti-inflammatory drug.

[28] The ALJ included only two ER visits in 2020, failing to list two others. *See* Doc. 9.

did not allege migraines as a disabling impairment in her initial disability application, she had suffered migraines for years before her alleged onset date and been able to work full time, and Dr. Shah's treatment notes largely reflect "good control" of her migraines with Botox. AR 5569-70.

Substantial evidence supports the ALJ's evaluation of Plaintiff's migraines; to find otherwise would require reweighing the evidence. Throughout 2015, prior to visiting the Mayo Clinic and starting Botox, Plaintiff went to the ER with migraines multiples times a month. AR 633, 682, 731, 751, 763, 776, 789, 805, 821, 834, 854, 869, 901, 916, 929, 944, 964, 978, 1078, 1123, 1178, 1235, 1261, 1306. During her initial visit with Dr. Shah in May 2016, she reported using Botox as a preventative medication and sumatriptan (Imitrex) as an abortive medication, with a 50% reduction in headaches and "good control" of her headaches. AR 2301-06.[29] At the time of her alleged onset date in September 2017, she received Botox injections every three months, with trigger point injections in between; she was also prescribed anti-nausea medications, since she often felt nauseous when suffering a migraine, and rizatriptan (Maxalt) as an abortive medication.[30] Her preventive medication remained Botox and trigger point injections through July 2022. *See* Doc. 9. For abortive medications, Dr. Shah's medication list reflects she used rizatriptan through July 2020[31] (as well as sometimes additionally using

[29] She continued to have some months with multiple ER visits for migraines in the first half of 2016 as she dealt with insurance coverage for Botox. *See* AR 2276-79.

[30] She received a prescription for butalbital-acetaminophen-caffeine (Fioricet), a migraine abortive medication, during an ER visit in April 2017, and Dr. Shah "reordered" this medication in May 2017. AR 538, 2646. It is unclear when exactly she changed her abortive medication from this to rizatriptan, but it was sometime close to her alleged onset date in 2017: Dr. Shah's August 18 treatment note lists Fioricet in the medication list (AR 2601); Dr. Shah included no migraine abortive on the medication list on October 4 (AR 2829-30); an ER visit from November 1 lists only rizatriptan as an abortive medication (AR 466); and Dr. Shah's November 30 treatment note includes both Fioricet and rizatriptan (thereafter, only rizatriptan is listed).

[31] *See* AR 2857, 624, 3111, 2919, 2928, 2943, 3098, 2961, 2951, 4121, 5220, 4132, 4434, 4445, 4817-18, 4448, 4814.

over-the-counter Excedrin,[32] sumatriptan,[33] or Fioricet[34]); and changed to Relpax (eletriptan) in July 2020 and additionally added Zomig (zolmitriptan) nasal spray in September 2020, Fioricet in November 2020, and Ubrelvy (ubrogepant) in March 2021, retaining prescriptions for these four medications through March 2023 (then dropping to just Zomig and Ubrelvy).[35] Dr. Shah's treatment notes are sparse, but as the ALJ noted, they reflect Plaintiff's migraines were stable and under control from late 2017 through March 2022.[36] For the most part, Dr. Shah's treatment notes do not reflect the frequency of Plaintiff's headaches, except one headache a week in August 2017 (AR 2600); less

---

[32] *See* AR 2951, 2961, 2981, 3079, 3075, 4814. She continued to report taking Excedrin throughout the relevant time period. *See, e.g.*, AR 4684, 4800, 5421, 5431, 5435, 5440, 7170.

[33] Dr. Shah's treatment notes include both rizatriptan and sumatriptan on the medication list from September 2018 to May 2019. AR 2981, 3079, 3005-05, 3507, 3075, 3524, 3530-31, 3556-57, 3562.

[34] Dr. Shah's treatment notes include both rizatriptan and Fioricet on the medication list from October 2019 to February 2020. AR 4162-63, 4181, 4201, 4415.

[35] AR 4470 (July 2020: Relpax added); AR 4507 (September 2020: reported Relpax made her drowsy and so Dr. Shah prescribed Zomig); AR 4532-33, 4537 (November 2020: reported Zomig made her sick and Dr. Shah stated she "failed" Zomig and "multiple other triptans" so prescribed Fioricet; Relpax and Zomig both appear on medication list); AR 4549 (December 2020: Relpax, Zomig, and Fioricet on medication list); AR 4585 (February 2021: Relpax and Fioricet on medication list); AR 4619, 4635 (March 2021, May 2021: Relpax, Fioricet, and Ubrelvy on medication list); AR 4641, 4649, 4656, 4672, 4965-66, 4972, 4982-83, 5015-16, 5046, 6517 (June 2021 through March 2023: Relpax, Zomig, Fioricet, and Ubrelvy on medication list); AR 6526 (April 2023: Ubrelvy on medication list); AR 7429, 7437 (June and July 2024: Zomig and Ubrelvy on medication list); *see also* AR 7170 (medication list in Dr. Rathe's June 2023 treatment note includes Zomig and Ubrelvy).

[36] Dr. Shah's treatment notes reflect that from November 2017 through May 2018, Plaintiff was "doing well," "good," "better," or suffering less than three headaches a month (AR 624, 2843, 2856, 2918, 2928); that from June 2018 through October 2019, her headaches were under "good control" or doing "really great" (AR 2942, 2960, 2981, 3003, 3506, 3523, 3529, 3555, 3561, 4120, 4131, 4162); that from November 2019 through March 2022, Botox decreased her headache frequency by 50% (AR 4180, 4200, 4415, 4447, 4475, 4481, 4532, 4549, 4584, 4618, 4634, 4641, 4648, 4656, 4671, 4678, 4965, 4971); and additionally, that she was doing "well" in May 2020 and February and March 2021 (AR 4444, 4584, 4618); that her headaches were under good control in September 2020 (AR 4507); and that her headaches were a little worse due to weather in October 2021 (AR 4671).

than two or three headaches a month in December 2017 (AR 2856); and one migraine in the last three months in both March and September 2018 (AR 2918, 2981). Plaintiff instead relies on treatment notes from NP Groeneveld at the pain clinic or her psychiatrist Dr. Rathe, reflecting weekly migraines.[37] But it does not seem that these weekly migraines were so severe so as to impose any functional restrictions (let alone of the severity necessary to equal Listing 11.02): she told Dr. Rathe in October 2021 that she usually worked through her weekly headaches (AR 5401); she told an ER provider in April 2022 that although she suffered a daily headache, she had not had a "bad migraine" for a few months (AR 4684); and she also told the Social Security Administration that she had to get a ride to work when she was suffering a migraine, suggesting she could work with a typical migraine (but not drive) (AR 5862). The record does not support, as Plaintiff argues, that she had to sleep when suffering one of her weekly migraines (there may have been "bad" migraines during which she needed to sleep, but these migraines occurred much less frequently than weekly).

In April 2022, Dr. Shah's treatment notes reflect that Plaintiff reported suffering daily migraines since a serious fall in December 2021 (which resulted in a broken rib). AR 4981; *see also* AR 5410 (Plaintiff told Dr. Rathe in April 2022 migraines had increased from weekly to daily and were incapacitating at least twice a week). In July 2022, she asked Dr. Shah about switching from Botox to another medication, noting that Botox had lost its efficacy. *See* AR 5014-15, 5020; *see also* AR 5022. Dr. Shah gave her one last Botox injection while she worked to get insurance approval for a different medication. *Id.* In September 2022, Plaintiff tried an infusion medication, Emgality, but by the next month, she was taking a different infusion medication, Vyepti; she

[37] AR 3014, 4188, 4425, 4456, 4498, 4514, 4540 (NP Groeneveld's notes from December 2018 through November 2020 reflect migraines improved from near daily to weekly); AR 5366, 5401 (Dr. Rathe noted weekly headaches in February and October 2021); AR 5397 (Dr. Rathe noted daily, occasionally incapacitating headaches in July 2021); *see also* AR 4800 (ER treatment note from January 2021 reflects weekly migraines); AR 4793 (ER treatment note reflects headaches "recurring more frequently" in May 2021).

remained on Vyepti for the rest of Dr. Shah's treatment notes in the record. *See* AR 5050, 5430. Although Plaintiff continued to report a debilitating migraine once a week to her psychiatrist Dr. Rathe (AR 5435, 5439, 7169, 7463), she reported "doing well on Vyepti" to Dr. Shah and did not present to the ER again with a migraine after starting Vyepti. AR 6516, 6525, 7429, 7436.

The ALJ could rely on Dr. Shah's treatment notes as the provider treating Plaintiff's headaches, rather than Dr. Rathe's or NP Groeneveld's notes. Dr. Shah's treatment notes largely reflect a stable condition well-controlled with medications, other than a brief period in 2022 (after which Dr. Shah adjusted her medications, and her migraines seemed to stabilize even more than when she had been on Botox). Given the deferential substantial-evidence standard, I cannot find that the ALJ erred in evaluating Plaintiff's headaches.

I recommend finding that substantial evidence supports the ALJ's determination that Plaintiff's migraines did not equal a listing or require additional limitations in the RFC.

### *B. Stand and Walk for Four Hours*

Plaintiff challenges the ALJ's RFC finding that she could stand and walk for four hours. Plaintiff argues that the ALJ erred in failing to consider her worsening knee pain as time went on. Plaintiff complained of left knee pain in late 2017, but it did not seem to impact her functioning too much (and she did not report it as a reason for disability to the Social Security Administration), and it resolved with a partial knee replacement in March 2019. She reported her left knee gave out in October 2019, and she had surgery that same month to repair a meniscus tear. She complained of left knee pain from April to July 2020, resolved with physical therapy. Treatment notes do not reflect that she complained of left knee pain again until March 31, 2022, but from that point on, she consistently sought treatment for left knee pain.

The ALJ summarized Plaintiff's treatment in 2022, noting she obtained an MRI, was found to have a stress fracture of the medial tibial plateau, used a prescription medial unloader brace for varus instability, received several injections, and obtained a second opinion from orthopedic surgeons at the University of Iowa Hospital systems. AR 5567. The ALJ acknowledged an objective examination in November 2022 showing "the knee was stable to varus and valgus stress" but with "limited extension and flexion"; that provider also observed mild crepitus with flexion and extension and mild medial joint line pain. AR 5567, 7409. The ALJ did not mention other results on objective examination in 2022. *See* AR 4978 (March 2022: range of motion limited due to pain; exam showed "a little bit of fluid and effusion of the left knee with mild crepitus with flexion-extension[,] she has palpable plica bands that are uncomfortable on the medial and lateral side of the" knee); AR 5006 (May 2022: good range of motion); AR 5027 (July 2022: antalgic gait favoring left); AR 5047 (August 2022: full range of motion; tenderness in medial joint line); AR 5039, 5042, 5052 (September 2022: range of motion limited due to pain); AR 7399 (early December 2022: significantly tender to palpation over the medial patella and medial tibial femoral joint line; range of motion from full extension to 120 degrees of flexion; negative McMurray's test; intact sensation; negative anterior and posterior drawer); AR 6114 (mid-December 2022: good range of motion and mild crepitus). When one of the second-opinion orthopedic surgeons recommended knee replacement due to the arthritic changes shown on her MRI, she underwent that procedure with Dr. Eagen in January 2023. *See* AR 6114, 6160, 7399.

The ALJ did not discuss most of the treatment Plaintiff underwent for her left knee in 2023. *See* AR 5567. She completed twenty-three physical therapy sessions in February and March 2023 and reported her knee felt "good." AR 6566-68. But within a month after her knee surgery, Plaintiff began complaining of a burning pain down her left leg into her ankle and foot, and she continued to report this nerve pain at physical therapy discharge. *See* AR 6118, 6575-6607; *see also* AR 6116. Plaintiff's orthopedic surgeon referred her for an EMG, which showed signs of active denervation suggestive

of S1 radiculopathy (meaning the low back was the source) but could not rule out peroneal mononeuropathy at the knee (meaning nerve damage in the knee was the source). AR 6523-24. She presented to the ER twice in March 2023 due to her left leg nerve pain (only one of these visits is in the record). AR 7181. Plaintiff underwent an MRI of the lumbar spine in April 2023 that her neurologist concluded was normal; therefore, based on the EMG, her neurologist believed she had a sciatic nerve injury in her upper thigh. AR 6530. She underwent eight physical therapy sessions for sciatic pain in May and early June 2023 but stopped due to the high out-of-pocket cost when she maxed out her insurance benefits for the year. AR 6537-67.[38] She visited the pain clinic from April to August 2023, but these treatment notes are not in the record, just the procedures performed (lumbar epidural steroid injection, left SI joint injection, lumbar facet nerve block, left lumbar radiofrequency ablation) (providers continued to disagree whether the source of Plaintiff's sciatic pain was her low back or a damaged nerve in her leg from the tourniquet used during surgery). AR 6556, 7184-94. In November 2023, she presented to the ER after her sciatic pain caused her leg to give out and she fell, breaking her two front teeth. AR 7320. The ALJ acknowledged this fall, but not by citing the ER record itself, but through Plaintiff's report to her psychiatrist. AR 5567, 7463.

As the ALJ noted, Plaintiff had a long-awaited neurosurgery consult in January 2024. AR 7340, 7463. The doctor noted that although her EMG had suggested S1 radiculopathy, her MRI and CT[39] scan did not show significant pathology from her low

---

[38] Objective examinations to this point were largely normal. *See* AR 7181 (March 2023 ER: good range of motion of all joints, no swelling, no lumbar tenderness); AR 6567 (March 2023 physical therapy discharge: normal left knee range of motion, normal hamstring and quad strength, ambulated with normal gait pattern, able to perform squats with normal body mechanics); AR 6529-30 (April 2023: normal gait, normal strength, normal musculoskeletal range of motion, negative Romberg sign); *but see* AR 6557 (May 2023: no sensation over left heel, lateral aspect of left foot, or two toes on left foot; slight weight shift to right doing squats; strength 4/5 on left; positive slump test, sacral thrust, and Gaenslen's test; negative straight leg raises but positive straight leg raises with the addition of ankle dorsiflexion).

[39] Computed tomography.

back (the ALJ continued not to acknowledge the April 2023 EMG). AR 5567, 7345. The ALJ noted objective examination showed normal strength, intact sensation except for slight decreased sensation in the left foot, and negative straight leg raises (the doctor additionally observed no ankle clonus or Babinski sign). AR 5568, 7345. Plaintiff told her psychiatrist in February 2024 that her nerve pain made it difficult to sleep and that she had recently stopped gabapentin and started Lyrica to treat the pain (the treatment note making these medication adjustments is not in the record). AR 7479. As the ALJ noted, Plaintiff also underwent another normal lumbar spine MRI in April 2024 (as described in a later treatment note; the record appears to be missing the notes from the provider who ordered this imaging). AR 5568, 7368. Plaintiff met with another neurosurgeon in May 2024; this treatment note is also missing from the record. *See* AR 7444. In June 2024, she met with Dr. Shah continuing to complain of severe pain radiating from her left knee, down her calf, and into her toes; Dr. Shah referred her to injectable medicine. AR 7429. She returned to Dr. Shah in July 2024, noting pain management had not helped her (the pain clinic notes are not in the record). AR 7436. Dr. Shah observed normal gait, suggested the cause for Plaintiff's pain was complex regional pain syndrome with hyperesthesia on the left leg, prescribed Savella, and ordered a brain MRI to rule out other etiologies. AR 7436-42. (The ALJ did not discuss Dr. Shah's June and July 2024 treatment notes.)

In late July 2024, Plaintiff presented to the University of Iowa Hospital pain clinic (as the ALJ noted). AR 7361-69. The ALJ recorded the provider's objective findings: normal range of motion of the lumbar spine and lower extremities; 5/5 strength throughout except 4/5 dorsiflexion and foot eversion on the left; symmetric muscle bulk with no atrophy or gross deformities; normal reflexes; intact neurological nerves; and reduced sensation to light touch in the left leg up to the knee. AR 5568, 7367. The ALJ did not acknowledge many of the provider's abnormal findings on objective examination: straight leg raise positive on the left to forty-five degrees; with regard to the left hip, positive FABER and Gaenslen's tests and tenderness to palpation; and Trendelenburg

gait. *Id.* Plaintiff stated that her symptoms had progressed and she could no longer walk properly due to pain and had developed left hip pain; she reported several falls, most recently a month ago. AR 7361. Given her past test results and the doctor's objective examination, the doctor believed the source of her pain to be common peroneal mononeuropathy (nerve damage to her left leg) (not complex regional pain syndrome) and recommended a peroneal sprint implant. AR 7369. Plaintiff wanted to proceed, but her insurance would not cover it. AR 7444.

Plaintiff went to the ER for her nerve pain in September 2024; this treatment note is not in the record (or mentioned by the ALJ). AR 7444. She met with a pain clinic provider the next week, who ultimately could not offer anything to treat her pain other than increasing her Savella dosage. AR 7452. The provider noted she had been seen by many providers with no improvement to her pain; he referred her to the Mayo Clinic. *Id.* The ALJ did not acknowledge this outcome, just the provider's objective examination: no distress, weight bearing bilaterally, normal range of motion of the lower extremities, no joint instability, no sensory deficit to light touch but allodynia in the left lateral calf and foot, negative straight leg raise, and tenderness of the right SI joint (the ALJ did not note the largely normal strength except 4/5 ankle dorsiflexion). AR 5568, 7448-49.

Plaintiff met with the Mayo Clinic specialist in October 2024. AR 7528-29. The ALJ did not discuss this note other than to (incorrectly) state an EMG was "suggestive of S1 radiculopathy" (the ALJ cited the confused providers' earlier interpretation of the April 2023 EMG). AR 5568. On objective examination, the Mayo Clinic specialist observed mild crepitus with end-stage extension, full extension and flexion to 130 degrees, mild tenderness proximal to the fibular tunnel, Tinel's sign for her sural nerve at the lateral malleolus but not at her thigh or leg itself, strong dorsiflexion and toe extension, and decreased sensation in the deep and superficial branches of the peroneal nerve but also in the sural distribution. AR 7528-29. An EMG obtained that day showed abnormalities in the sural and peroneal nerves, and the Mayo Clinic specialist suggested

an ultrasound of both nerves and decompression surgery depending on the ultrasound results. *Id.* As recognized by the ALJ, the ultrasound ultimately showed no structural abnormalities of either nerve, and the Mayo Clinic specialist offered surgery to improve the peroneal nerve that he suspected was being impinged at the peroneal tunnel; at the time of the final ALJ hearing, Plaintiff awaited this surgery. AR 5568, 7596.

In discussing the limitations caused by Plaintiff's knee impairment, the ALJ noted "intact gait throughout the period under review." But some treatment records after 2022 *do* reflect issues with Plaintiff's gait. In addition, the ALJ did not acknowledge the seriousness of Plaintiff's November 2023 fall due to her left leg sciatica (resulting in broken teeth and an ER visit). The ALJ also noted Plaintiff engaged in activities such as shoveling snow, citing evidence from February 2021, before her knee issues started up again. AR 5570. Activities of daily living from 2022 include that Plaintiff moved in with her parents in March 2022 for financial support and help with chores, meals, and her children (AR 5405-06, 5410, 5415); she reported working out caused her stress fracture in March 2022 (AR 4978, 5415); she decorated and organized the new house and cooked with her children (AR 5416, 5425); she stated she enjoyed going to the gym (AR 5430); and in November and December 2022 she reported chores and work were limited because she could not be on her feet for very long (AR 5430, 5435); *see also* AR 7416 (reported she could carry out most activities of daily living, including walking, climbing stairs, carrying groceries, or moving a chair in pain clinic questionnaire in November 2022). After receiving an epidural injection, in May 2023, she reported being more active and cleaning out her car, and in June 2023, she reported moving furniture and performing other strenuous activities. AR 6541-42, 6547-48. Prior to 2022, it seems she was often able to work twenty hours a week, but she cut her hours to only five to six hours a week (two to three hours at a time) (whether due to migraines or left leg pain). Plaintiff totally quit hairstyling after her knee replacement surgery and sciatic pain started in 2023.

No doctor—not even the state agency consultants—evaluated the effects of Plaintiff's knee condition on her ability to stand and walk. It is unclear how the ALJ determined that Plaintiff could stand and walk for a total of four hours in a day, especially because it appears Plaintiff had to quit her part-time job because she could not do precisely that. The ALJ oversimplified and ignored much of Plaintiff's recent treatment for her left knee. The ALJ also erred by relying on Plaintiff's functional abilities from earlier in time, before the onset of her sciatic pain. Not only did the ALJ fail to develop the record with opinion evidence on the functional limitations caused by Plaintiff's left knee, many treatment notes from 2023 are missing from the record (and the ALJ ignored ones that are in the record).

The Commissioner argues that "[t]he medical evidence at the beginning of the relevant period and at the end of the relevant period supports Plaintiff's ability to stand and walk at least four hours in an eight-hour workday." Doc. 15. In support, the Commissioner cites the pain clinic provider's objective examination from September 2024 (reflecting normal weight bearing, range of motion, and a negative straight leg raise test). The pain clinic provider did not interpret these results to mean Plaintiff could stand or walk for four hours in an eight-hour day (nor did any medical source). Nor did the provider suggest the results of the objective examination somehow called Plaintiff's pain into question—indeed, he took her pain complaints very seriously and referred her to the Mayo Clinic. The Commissioner cannot rely on an objective examination from one date to the exclusion of other results in the same timeframe. In any event, I fail to see how this objective examination demonstrates Plaintiff's ability to stand and walk four hours a day, five days a week. Her knee pain in 2022 was ultimately supported by objective evidence in the form of arthritic changes shown on her MRI (as well as some abnormal findings on objective examination) and resulted in a total knee replacement; and although it took visits to multiple providers to determine the source of her left-leg sciatic pain in 2023 and 2024, abnormal EMG results showed damage to a nerve in her leg, likely from the tourniquet used during knee replacement surgery (as well as abnormal findings on

objective examination that seemed significant to providers with more medical expertise than the ALJ).

*Noerper v. Saul*[40] is remarkably similar to this case (although Plaintiff's treatment for her knee pain here is much more involved than the *Noerper* claimant). In *Noerper*, an MRI showed deteriorated cartilage in the claimant's right knee in 2008; she quit working in 2010; and treatment notes throughout 2013 and 2014 did not reflect specific complaints of knee pain, although claimant did routinely receive a prescription NSAID for arthritic pain.[41] Then, throughout 2015, claimant complained of knee pain to her primary care provider and an orthopedist; obtained an MRI of her left knee which showed marked damage to her cartilage; was recommended arthroscope surgery and physical therapy, neither of which her insurance would cover; and received several knee injections.[42] The court noted the ALJ could consider claimant's gap in treatment, the pain relief given by injections in 2015, records as late as February 2015 describing her pain as "mild," and the primary care provider's normal "descriptions of [plaintiff's] gait, station, and sensation."[43] But the court suggested the ALJ erred by relying on the primary care provider's objective examinations and failing to "acknowledge the limitations on strength and range of motion discussed" by the orthopedist.[44] And the court held substantial evidence did not support the ALJ's RFC determination regarding the claimant's ability to stand and walk.[45] The court noted "the ALJ did not explain how he translated his understanding of [claimant's] physical symptoms into the conclusion that she could stand or walk for 6 hours of an 8-hour

---

[40] 964 F.3d 738 (8th Cir. 2020).

[41] ***Id.*** at 741-42.

[42] ***Id.*** at 742-43.

[43] ***Id.*** at 746.

[44] ***Id.*** at 745-46.

[45] ***Id.*** at 746-47.

workday."[46] And the only medical opinion in the record (finding claimant could stand or walk for six hours in an eight-hour day) failed to "connect[] the dots between the severity of pain and the precise limits on a claimant's functionality," since the state agency consultant issued the opinion in 2014, "predat[ing] the majority of the treatment records concerning [claimant's] knee condition."[47]

Here, as in *Noerper*, the ALJ cherry-picked the results of favorable objective examinations. As in *Noerper*, the ALJ failed to explain how those objective examinations translated into the length of time Plaintiff could stand and walk, day in and day out. And like *Noerper*, no medical opinion evaluated the effects of Plaintiff's knee pain on her physical functioning. Under the circumstances, substantial evidence does not support the ALJ's RFC determination regarding Plaintiff's ability to stand and walk for four hours a day upon the reoccurrence of her left knee pain in 2022.[48]

"Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and [the court] find[s] that such a denial was improper, [the court], out of [its] 'abundant deference to the ALJ,' remand[s] the case for further administrative proceedings."[49] The court may, however, remand for an award of benefits "if the record 'overwhelmingly supports'" a finding of disability.[50]

Here, the VE testified at the most recent ALJ hearing that if Plaintiff were further limited in her ability to stand and walk (to only two hours a day), there would be only

---

[46] ***Id.*** at 744.

[47] ***Id.*** at 746-47.

[48] Plaintiff also argues that her obesity and neck pain support that she could not stand and walk for four hours a day prior to 2022. Substantial evidence supports the ALJ's conclusions in this regard. Prior to 2022, Plaintiff engaged in many activities of daily living where she was on her feet for long periods of time, including working part-time as a hairstylist twenty hours a week and enjoying long walks.

[49] ***Buckner v. Apfel***, 213 F.3d 1006, 1011 (8th Cir. 2000) (quoting ***Cox v. Apfel***, 160 F.3d 1203, 1210 (8th Cir. 1998)).

[50] ***Id.*** (quoting ***Thompson v. Sullivan***, 957 F.2d 611, 614 (8th Cir. 1992)).

three jobs that she could perform, totaling 17,600 positions in the national economy. AR 5648-49. This court has recognized courts "draw the line between a 'significant' and an insignificant number of jobs in the national economy—without evidence of the number of jobs available locally—at around 20,000 jobs."[51] Thus, Plaintiff's ability to stand and walk four hours in an eight-hour day is crucial to a finding of non-disability.

Based on the evidence outlined above, I recommend finding that the record overwhelmingly supports a finding that Plaintiff could not stand and walk for four hours a day upon the onset of her knee pain in 2022. I further note that Plaintiff's application for disability benefits has been pending since 2017 and previously been remanded by this court twice before.[52] "Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate."[53]

I recommend finding that the ALJ's finding that Plaintiff could stand and walk for four hours a day, day in and day out, is not supported by substantial evidence for the entirety of the relevant time period. I recommend remanding for an award of benefits as of March 31, 2022, the onset of Plaintiff's knee pain and when treatment records begin to reflect limited work hours due to pain and other impairments in combination.

### *C. Mental Functioning and Opinion Evidence*

Plaintiff focuses her arguments on physical functioning and migraines. She argues briefly, however, that the ALJ erred by "rejecting the available medical opinion evidence concerning . . . mental limitations, without obtaining a further opinion from a consultative

---

[51] ***Christina W. v. Bisignano***, No. 25-CV-2051, 2026 WL 2594778, at *13 (N.D. Iowa Sept. 2, 2026) (quoting ***Shari B. v. Kijakazi***, No. 22-cv-1539, 2023 WL 6130679, at *8 (D. Minn. Sept. 19, 2023)), *report and recommendation adopted*, No. 25-CV-2051, Doc. 27 (N.D. Iowa Set. 29, 2026) (clear-error review on this issue).

[52] ***Burns v. Saul***, No. 19CV00105, 2020 WL 1812048, at *3 (E.D. Ark. Apr. 9, 2020) (considering prior remands in determining to remand for an award of benefits), *report and recommendation adopted,* 2020 WL 4455928 (Aug. 3, 2020) (clear-error review).

[53] ***Hutsell v. Massanari***, 259 F.3d 707, 714 (8th Cir. 2001) (quoting ***Parsons v. Heckler***, 739 F.2d 1334, 1341 (8th Cir. 1984)).

examiner or a medical expert before deciding [Plaintiff's] claim." Doc. 9. Plaintiff does not argue what limitations the ALJ failed to adopt from the medical opinions. Plaintiff notes that the state agency consultants limited Plaintiff to work with only three to four step commands but does not acknowledge that Therapist Haberman found Plaintiff could satisfactorily understand, remember, and carry out simple instructions (as in the ALJ's RFC). *See* AR 3577, 5445, 5566; Doc. 9.

Plaintiff's argument largely seems to be one of legal error based on this court's line of cases interpreting the Eighth Circuit's "some medical evidence" standard, which as noted above, has been recently abrogated. I recommend finding that the ALJ did not err by failing to further develop the record with medical-opinion evidence on Plaintiff's mental functioning.

## *III. CONCLUSION*

I recommend **reversing** the Commissioner's decision, entering judgment in favor of Plaintiff, and remanding for an award of benefits as of March 31, 2022.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[54] Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[55]

**DATED** September 30, 2026.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[54] **Fed. R. Civ. P. 72**.

[55] *See* ***United States v. Wise***, 588 F.3d 531, 537 n.5 (8th Cir. 2009).